**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL VACKAR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-3716 |
| | § | |
| SENTRY SUPPLY INC., d/b/a Superior Supply & Steel, | § § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Sentry Supply, Inc., doing business as Superior Supply & Steel, moves for summary judgment dismissing the claim of its former employee, Michael Vackar, that he was fired in retaliation for refusing to commit a crime. Vackar alleges that he was fired for refusing to take customers to sexually oriented bars and clubs and to pay prostitutes to have sex with customers. Vackar sued in state court, alleging wrongful discharge under the doctrine established in *Sabine Pilot Serv., Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex. 1985), which prohibits an employer from firing an employee based solely on his refusal to perform an illegal act. Superior timely removed on the basis of diversity jurisdiction, answered, counterclaimed, and moved for partial summary judgment. Superior asserts that the undisputed evidence shows that it did not instruct Vackar to commit a crime or fire him for refusing to do so, and that it fired Vackar because he submitted four fraudulent expense reports for reimbursement.[1] Superior also seeks sanctions for Vackar's frivolous claims. (Docket Entry No. 19). Vackar responded, (Docket Entry No. 20), and Superior replied,

---

[1] Superior has not moved for summary judgment on its counterclaims for fraud, money had and received, slander, libel, business disparagement, tortious interference with prospective relations, and malicious prosecution or on its declaratory judgment requests.

(Docket Entry No. 24).  Superior also filed a notice of deemed admissions, (Docket Entry No. 26), which Vackar opposes, (Docket Entry No. 27).

Based on the pleadings; the motion, response, and reply; the summary judgment evidence; and the applicable law, this court grants Superior's motion for partial summary judgment, denies the motion for sanctions without prejudice to later reassertion in connection with the counterclaims, and grants Vackar's request to withdraw the admissions.  Vackar must serve his response to Superior's third set of requests for admission no later than **July 29, 2013**.  A hearing is set to address remaining issues in the case on **August 2, 2013**, at 8:30 a.m., in Courtroom 11-B.

The reasons for these rulings are explained below.

**I.     Background**

Much of the evidence is undisputed.  Vackar worked at Superior as a sales representative from January 16 to March 23, 2012.  (Docket Entry No. 19 at 7).  He did not make a sale during that period.  (*Id*. at 10).  Superior asserts, and there is no controverting evidence, that Vackar's poor performance was a concern from the beginning.  Kotcher first expressed concern over Vackar's sales ability on January 26, 2012, only ten days after Vackar began work, in an email to the recruiter who had introduced him to Vackar.  (Docket Entry No. 19, Exs. J-6 & J-8 ).  Kotcher discovered that Vackar had far fewer industry contacts than expected for someone who had been in the industry for 35 years.  (*Id.*, Ex. J at 7).  Another salesperson Superior hired had 74 contacts; Vackar listed only 17 or 18.  (*Id*., Ex. J-14).  In a February 17 email to Wayne LeBert, Superior's executive vice-president, and Steve Mitchell, Superior's president, Kotcher described Vackar as "disappointing," stating that he "does not seem organized and quite frankly has not earned my trust."  Kotcher wrote that Vackar needed "to perform in the next 30–45 days or [the company needed] to start considering

alternative action." Kotcher stated that he had instructed Superior's recruiter to keep "his eyes open for possible other candidates." (*Id.*, Ex. A-14 at 65).

On March 20, Kotcher emailed Superior's recruiter after accompanying Vackar to a sales meeting. Kotcher stated that "it was a train wreck watching [Vackar] speak with a customer." (*Id.*, Ex. A-16 at 2). He described Vackar as "one of the worst communicators I have ever met in my 20 years of business . . . ." (*Id.*). Kotcher noted that he was interviewing other candidates for Vackar's position and asked the recruiter to "start pushing hard to find a replacement." (*Id.*).

On March 21, while on a tour of a potential customer's facilities, Kotcher met Debbie Salinas, who Vackar listed as a contact and claimed to have met with several times, including over dinner the previous week. Vackar had submitted an expense report for the dinner meeting with Salinas and one of her coworkers, but Salinas had trouble remembering Vackar and denied that the dinner meeting had occurred. (*Id.*, Ex. J at 11). Vackar admits that he did not meet with Salinas and submitted a false expense report. (*Id.*, Ex. A at 25). Kotcher discovered three additional instances in which Vackar had falsified expense reports seeking reimbursement. The first was a report seeking reimbursement for a dinner with Mike Jones and his wife on Valentine's Day, February 14, 2012. Vackar now admits he did not have dinner with Jones (who was not married), (*id.*, Ex. A at 20), which Jones confirmed, (*id.*, Ex. H at 2). The second was an expense report seeking reimbursement for purchasing a $100 gift card for Cory McShannon as a charitable auction donation. Vackar admits that he did not give a gift card to McShannon, (*id.*, Ex. A at 25), and McShannon confirmed that he never received a gift card, (*id.*, Ex. G at 2). The third was a dinner with Steve Tinsley and his wife on March 7, 2012. Vackar admits that he did not have dinner with Tinsley, (*id.*, Ex. A at 22), which Tinsley confirmed, (*id.*, Ex. I at 2).

On March 23, Kotcher called Vackar into his office to discuss the expense reports. Linda Shilling, another employee, was also present. (*Id.*, Ex. J at 14). Kotcher explained to Vackar that the individuals named on the expense reports had denied seeing him recently or having any meals with him. Kotcher offered to call the individuals listed in the expense reports and to give Vackar the chance to explain "what's really going on and be truthful." (*Id.*, Ex. K, ¶ 37; Ex. K-3; Ex. J). When Vackar refused both offers, Kotcher fired him. Superior later uncovered additional evidence that Vackar lied about his contacts and attendance at sales meetings. (*Id.*, Ex. J-25 at 28; Ex. J-26 at 30).

After he was fired, Vackar submitted an application for unemployment benefits to the Texas Workforce Commission (TWC). Vackar stated on the application that he was no longer employed because he "[d]id not like my work." (*Id.*, Ex. S at 2). In Superior's response to the TWC, Kotcher listed four reasons for Vackar's termination: falsifying and misrepresenting expenses on expense reports; falsifying call and sales reports; nonperformance; and insubordination. (*Id.* at 4).

Several months after he was fired, Vackar filed this suit. Vackar alleged that from the beginning of his employment at Superior, he was instructed to take clients to strip clubs and pay strippers to have sex with them. In his summary judgment response, Vackar submitted his own declaration as evidence. In his declaration, Vackar does not deny that he submitted false expense reports. But he states that Kotcher told him to "pad" the expense reports to get cash to take his customers to strip clubs and pay the dancers at the clubs to have sex with them. (Docket Entry No. 20, Ex. 1). Vackar asserts that when he refused, Kotcher told him he would still need to pad his expense reports so that he could take Kotcher and sales staff to strip clubs for business meetings. Vackar does not state that any meetings were held at strip clubs. Vackar asserts that when he

4

threatened to report Kotcher to corporate headquarters "in early March," Kotcher sent an email to all employees about Superior's expense report and entertainment policy, including a statement that places like strip clubs should be "avoided." (*Id*.). Vackar states that, on March 16, 2012, he and another salesman, Larry Samek, attended a sales meeting with Kotcher, who again told Vackar to solicit strippers for customers. When Vackar refused, Kotcher "exploded angrily," told Vackar "to get [his] customers bred," and left the meeting "in a huff." (*Id.*). One week later, the day before a corporate meeting in Louisiana, Kotcher fired Vackar for falsifying expense reports. Vackar points out that Kotcher did not call the police or press criminal theft charges against him, and that reimbursements for the disputed expenses were included in his last paycheck. (*Id*.).

Superior has submitted affidavits from eight current and former Superior employees, including Kotcher and Samek, denying that they ever witnessed Kotcher instruct Vackar or anyone else to take clients to strip clubs or pay for prostitution. (Docket Entry No.19, Exs. J, L, M, N, K, O, P, Q). Superior has also submitted evidence that Vackar falsified expense reports without any instruction from Kotcher. In emails Vackar sent before Kotcher learned of the expense account fraud, Vackar justified the Jones dinner, (*Id.*, J-21 at 19), the McShannon gift card, (*Id.*, Ex. J-23 at 24), and the Salinas dinner, (*Id.*, Ex. 19 to Ex. J-14), as furthering client relations. Kotcher also stated that even before he learned that Vackar's expense reports were fraudulent, he believed that Vackar was submitting unnecessary and excessive expenses. On March 8, Kotcher sent an email to the sales staff, including Vackar, reminding them of Superior's expense and entertainment policy. Kotcher emphasized the need for frugality, explaining, "Spend the company's money as you would your own. We don't need to eat steak every time we go to dinner or order food in excess." (*Id*, Ex. D-26). Vackar responded to that email by stating that he understood "fully" but that clients could

"order a lot" when "someone else is picking up the check . . . . They are use[d] to being wined and dined." (*Id.*). Superior has also submitted evidence that Vackar told individuals, both inside and outside the company, that he liked working at Superior. (Docket Entry 19, Ex. A at 29; Ex. E;).

## II.     The Motion for Summary Judgment

### A.     The Legal Standard

"Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011) (quoting FED. R. CIV. P. 56(a)). "'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving parties, there is no genuine issue for trial.'" *Hillman v. Loga*, 697 F.3d 299, 302 (5th Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Under Rule 56, the moving parties "bear[ ] the initial burden of 'informing the district court of the basis for [their] motion, and identifying those portions of [the record] which [they] believe[] demonstrate the absence of a genuine issue of material fact.'" *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The parties moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but 'need not negate the elements of the non-movant['s] case.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *see also Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). If the moving parties fail to meet their initial burden, its motion for summary judgment must be denied, regardless of the non-movants' response. *See Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001); *Little*, 37 F.3d at1075.

When the moving parties have met their Rule 56 burden, the nonmoving parties cannot merely rest on the allegations in their pleadings. *See Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349–50 (5th Cir. 2005); *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). Rather, they are required to "'go beyond the pleadings'" and produce probative evidence to show "'that there is a genuine issue for trial.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075; citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87); *see also Izen v. Catalina*, 398 F.3d 363, 366 (5th Cir. 2005); *Taita Chem. Co.*, 246 F.3d at 385. If they do so, their evidence "is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Hillman*, 697 F.3d at 302; *Taita Chem. Co.*, 246 F.3d at 385. If, however, the nonmovants fail to respond appropriately, or if they fail to respond at all, summary judgment is not awarded to the moving parties simply by default. *See Ford–Evans v. Smith*, 206 F. App'x 332, 334 (5th Cir. 2006); *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th Cir. 1995); *Hibernia Nat'l Bank v. Administracion Cent. Soc. Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985); *John v. Louisiana*, 757 F.2d 698, 708 (5th Cir. 1985). Instead, summary judgment is appropriate only if the moving parties have demonstrated the absence of a genuine issue of material fact, and shown that judgment is warranted as a matter of law. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006); *Hetzel*, 50 F.3d at 362 n.3 (quoting *Hibernia Nat'l Bank,* 776 F.2d at 1279).

**B.    Analysis**

Under Texas law, an employer can "terminate an at-will employee without fear of legal repercussions for a good reason, a bad reason, or no reason at all." *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 502 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *County of Dallas v.*

*Wiland*, 216 S.W.3d 344, 347 (Tex. 2007)). *Sabine Pilot* establishes a common-law exception to the employment at-will doctrine, prohibiting an employer from firing an employee solely because that employee refused to perform an illegal act. 687 S.W.2d at 735. A claim for wrongful termination under *Sabine Pilot* requires a plaintiff to prove that: (1) he was required to commit an illegal act that carries criminal penalties; (2) he refused to engage in the illegality; (3) he was discharged; and (4) the sole reason for his discharge was his refusal to commit the unlawful act. *White v. FCI USA, Inc.,* 319 F.3d 672, 676 (5th Cir. 2003) (citing *Sabine Pilot,* 687 S.W.2d at 735).

To prevail under the "very narrow" *Sabine Pilot* exception, the former employee must prove that "his [or her] discharge was for no reason other than his refusal to perform an illegal act." 687 S.W.2d at 735. "An employer who discharges an employee both for refusing to perform an illegal act *and* for a legitimate reason or reasons cannot be liable for wrongful discharge." *Tex. Dept. Of Human Servs. Of State of Tex. v. Hinds*, 904 S.W.2d 629, 633 (Tex. 1995) (emphasis in original). The employee has the burden of proving that his termination was for no reason other than the refusal to perform the illegal act. *Sabine Pilot*, 687 S.W.2d at 735.

Superior argues that because the undisputed evidence, at a minimum, shows that it had reasons for firing Vackar that had nothing to do with his alleged refusal to perform an illegal act, summary judgment is appropriate. The court agrees. It is not necessary to rely on the deemed admissions to grant summary judgment dismissing the *Sabine Pilot* retaliation claim.

Superior has provided competent evidence that it had, and relied on, four legal reasons for firing Vackar: falsifying and misrepresenting expenses on expense reports; falsifying call and sales reports; nonperformance; and insubordination. To avoid summary judgment, Vackar had the burden

of pointing to evidence supporting the inference that the only reason for his firing was his alleged refusal to falsify expense reports to pay for providing sexual entertainment for clients.

Superior asserts that its immediate reason for firing Vackar was that he submitted false expense reports. Vackar admits that he submitted false expense reports but asserts that he did so at Kotcher's direction. (Docket Entry No. 20, Ex. A at 2). He asserts that Kotcher told him to falsify the expense reports for two reasons: first, to obtain money to pay the strippers Vackar was meant to solicit for customers and, second, to obtain money for sales meetings held in a strip club. (Docket Entry No. 20, Ex. A at 2). To the extent Vackar is arguing that he was fired in retaliation for refusing to perform an illegal act of padding expense reports, his argument fails because he did not refuse to take part in the alleged illegal activity. According to Vackar, he complied with Kotcher's request that he submit false expense reports so that they could have extra cash to pay for strippers and hold meetings at gentlemen's clubs. Under *Sabine Pilot*, an employee who participates in the illegal activity lacks a claim for wrongful termination. *White*, 319 F.3d at 677.

Additionally, without relying on credibility determinations, Vackar's declaration is contradicted by his own statements and conduct. He stated in his unemployment application that he was fired because he did not like his work. Although he asserts that he was fired when he threatened to expose Kotcher, uncontroverted evidence shows that Vackar did not reveal Kotcher's supposed scheme: when Kotcher confronted him about the false expense reports and fired him in front of another employee; to coworkers; to the recruiter in response to the questioning about whether he liked his job; or to Superior's president, despite Vackar's statement that he intended to do so. Vackar also offers no explanation for why, if Kotcher had participated in the fraud, Vackar

9

repeatedly lied to him about the falsified expense reports or why Kotcher emphasized the need for employees to be frugal when entertaining employees. In an email to Kotcher describing his sales progress, for instance, Vackar discussed the dinner with Debbie Salinas that he claimed on the expense report and described the discussions the two supposedly had. (Docket Entry No. 19, Ex. J-19 at 14).[2]

Superior submitted extensive evidence, mostly undisputed, including employee declarations, that its expense and entertainment policy prohibiting meetings at strip clubs was longstanding and that Kotcher never insisted on providing sexual entertainment for customers. (Docket Entry No. 19, Ex. J, K, L, M, N, O, P, and Q). Superior also submitted competent and uncontroverted summary judgment evidence showing that Vackar's lack of sales contributed to its decision to fire him. *See Ball v. Duty Free Americas, Inc.*, 2009 WL 780915, *5 (S.D. Tex. Mar. 23, 2009) (holding that an employer's documented dissatisfaction with employee's performance was a legitimate reason for her termination); *Griffith v. Wyndam Travel, Inc.*, 1999 WL 595818, *4 (Tex. App.—Dallas Aug. 10, 1999, no pet.) (holding that an employee's poor performance was a legitimate reason for his termination). In nine weeks with the company, Vackar failed to make a sale and was far from achieving his first, facts Vackar does not dispute. Emails from Kotcher show not only continued concern over Vackar's performance and failure to improve, but that Superior had already begun the process of replacing Vackar before it discovered the expense-report fraud. Some of these emails were sent even before the March confrontation with Kotcher that Vackar asserts led to his firing.

---

[2] Regardless of whether Vackar was told to falsify the expense reports, he never asserts that he was told to falsify his progress with potential customers. Discovering that Vackar was lying about his customer contacts and sales meetings is a legitimate reason to fire him that is independent of the falsified expense reports.

10

Vackar does not dispute his poor sales performance or his failure to follow Kotcher's directions about communications with potential clients.

No reasonable factfinder could conclude from the record that Vackar's termination was based solely on his refusal to take clients to sexually oriented clubs and spend money to have dancers provide them sexual favors. Nor could a reasonable factfinder conclude that none of Vackar's admitted performance deficiencies and rule violations was a reason for the decision to fire him.

Because Vackar has failed to demonstrate that there is a genuine fact issue material to whether he was fired solely for refusing to take part in illegal activity, summary judgment is granted dismissing Vackar's wrongful termination claim.

## III.  Sanctions

Superior seeks sanctions for Vackar's allegedly frivolous allegations in his pleading and other filings. Some of the sanctions sought are governed by Rule 11 of the Federal Rules of Civil Procedure, which "prohibits filings made with 'any improper purpose,' the offering of 'frivolous' arguments, and the assertion of factual allegations without 'evidentiary support' or the 'likely' prospect of such support." *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 39 (1st Cir. 2005) (citing FED. R. CIV. P. 11(b)(1)). The rule requires that a motion for sanctions "be made separately from any other motion" and be served on the opposing party 21 days before it is filed with the court. FED. R. CIV. P. 11(c)(2). Superior's motion is incorporated into its motion for summary judgment, and there is no indication in the motion that Superior served it on Vackar 21 days before filing. Superior's motion for sanctions under Rule 11 is denied.

Superior has also moved for sanctions under Rule 13 of the Texas Rules of Civil Procedure. The Fifth Circuit has held that "state sanctions rules [apply] to pleadings filed in state court before removal." *Tompkins v. Cyr*, 202 F.3d 770, 787 (5th Cir. 2000). Rule 13 applies to Vackar's petition, which was filed in state court. Unlike Rule 11 of the Federal Rules, Texas Rule 13 does not require the motion to be served on the opposing party before it is filed with the court. Because additional evidence relevant to Superior's Rule 13 motion is likely to be submitted by the parties in connection with Superior's counterclaims, Superior's motion for sanctions is denied without prejudice to Superior filing a new motion under Rule 13 at the appropriate time.

## IV.     The Requests for Admission

Superior submitted three sets of requests for admission on January 28 and 30 and April 5, 2013. Vackar responded to the first two sets of requests for admission late and did not respond to the third set at all. (Docket Enry No. 26). Vackar, who is now pro se, has asked that the deemed admissions be withdrawn. (Docket Entry No. 27). Under Rule 36(a) of the Federal Rules of Civil Procedure, "matters included in requests for admissions are deemed admitted if no written answer or objection is timely served on the requesting party." *Curtis v. State Farm Lloyds*, 2004 WL 1621700, at *4 (S.D. Tex. Apr. 29, 2004). Deemed admissions may be withdrawn under Rule 36(b), which provides:

> A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits.

FED. R. CIV. P. 36(b). The district court's "discretion must be exercised within the bounds of this two-part test: 1) the presentation of the merits must be subserved by allowing withdrawal or amendment; and 2) the party that obtained the admissions must not be prejudiced in its presentation of the case by their withdrawal." *Am. Auto. Ass'n (Inc.) v. AAA Legal Clinic of Jefferson Crooke, P .C.*, 930 F.2d 1117, 1119 (5th Cir. 1991) (citations omitted). The party making the admission bears the burden of showing that the presentation of the merits will be served; the party obtaining the admission bears the burden of establishing prejudice. *Curtis*, 2004 WL 1621700, at *4 (quoting *Coca–Cola Bottling Co. v. Coca–Cola Co.*, 123 F.R.D. 97, 102 (D. Del. 1988)).

Permitting Vackar's late responses to Superior's first two sets of requests for admission promotes the presentation of the merits and does not prejudice Superior. Those responses were filed before Superior filed its notice of deemed admissions or its summary judgment motion, and Superior relied on Vackar's responses to its requests for admissions in moving for summary judgment. Vackar has also shown a sufficient basis for withdrawing the third set of deemed admissions. Superior served those requests for admission on Vackar's attorney just before he withdrew from the case. Vackar has stated that his former attorney did not inform him of the requests and that he was not aware of them until after Superior filed its notice of deemed admissions. Withdrawing those admissions does not prejudice Superior. Vackar's responses to the third set of requests for admission were not due until after Superior had filed its summary judgment motion.

## V.     Conclusion

Superior's motion for partial summary judgment is granted. Superior's motion for sanctions is denied, without prejudice to Superior reasserting that motion at the appropriate time. Vackar's

request to withdraw the deemed admissions is granted. Vackar must serve his response to Superior's third set of requests for admission no later than **July 29, 2013**. A hearing is set to address remaining issues in the case on **August 2, 2013**, at 8:30 a.m., in Courtroom 11-B.

SIGNED on July 8, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge